# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| United States of America, | ) |
| | ) |
|        Plaintiff, | ) |
| | ) |
| v. | )    **Criminal Action Number** |
| | )    **07-00245-01-CR-W-ODS** |
| Ronald Elmquist, | ) |
| | ) |
|        Defendant. | ) |

## Report and Recommendation

Pending before the Court are the MOTION TO SUPPRESS EVIDENCE AND MEMORANDUM IN SUPPORT filed September 24, 2007 (Doc. #13) by defendant Ronald Elmquist ("Elmquist"), Elmquist's MOTION TO SUPPRESS STATEMENT AND MEMORANDUM IN SUPPORT filed September 24, 2007 (Docs. #14). On November 27, 2007, the undersigned held an evidentiary hearing on Elmquist's motions. Elmquist was present and was represented by his counsel, James Wyrsch and John Justin Johnson. The government was represented at the hearing by Assistant United States Attorney Roseann Ketchmark. At the evidentiary hearing, the government called one witness: Brandon Cox of QualServe Corporation. Elmquist called four witnesses: Detective Dan Justus of the North Kansas City Police Department, Detective Jason Steinke of the Heart of America Regional Computer Forensic Lab, Dan Dvorak of QualServe Corporation, and Sarah Bendure a paralegal employed by Elmquist's legal counsel. Additionally, Elmquist introduced into evidence nine exhibits:

| | | |
|---|---|---|
| Def't #1 | Recording of interview |
| Def't #2 | Excerpt of interview recording |
| Def't #3 | Miranda waiver |
| Def't #4 | Evidence receipt |
| Def't #5 | Application for search warrant |
| Def't #6 | Grand jury subpoena |
| Def't #7 | Transaction log |
| Def't #8 | Summary of interview |
| Def't #9 | Felony complaint |

On the basis of all the evidence adduced at the evidentiary hearing, the undersigned submits the following:

**PROPOSED FINDINGS OF FACT**

1. In 2006, Elmquist was the Chief Executive Officer for QualServe Corporation ("QualServe"). 7.

2. On July 11, 2006, Brandon Cox ("Cox") was employed as a desktop support analyst with QualServe. 6.

3. On that day, shortly after noon, Elmquist approached Cox and asked him to look at Elmquist's laptop computer because of spyware-related issues. 6-7, 18, 25, 43.

4. Cox thereafter took Elmquist's laptop computer to his work area and began performing basic diagnostic tests. 7.

5. After running some of the tests, Cox began going through some of "Temporary Internet" folders and the "My Recent Documents" folder in the laptop computer to ensure that any spyware files had been removed. 7-8.

6. While looking through these files on the hard drive of Elmquist's laptop computer, Cox found some images that he considered to be child pornography as well as one questionable video link. 7-8, 41, 44.

7. Upon finding the images, Cox called his father, Frank Cox, for advice. 9, 27-29.

8. Subsequently, Cox decided that it was "the best decision to make a back up" and he copied the file to the local drive on his computer and made two copies on CDs. 9, 17.

9. The decision to make the CDs was solely Cox's and was not based on input from anyone else, including law enforcement officers. 13-14.

10. Thereafter, Cox returned the laptop computer to Elmquist, but, shortly thereafter, Cox briefly retrieved the laptop computer again to switch the hard drives, with Cox retaining the original hard drive. 20-21, 44.

11. Cox and his supervisor at QualServe, Dan Dvorak ("Dvorak") decided to retrieve the original hard drive because it was "the original source" and "just a logical thing to do." 20-21, 36-38, 90-91.

12. The decision to retrieve and maintain the original hard drive was not based on any instruction from law enforcement officers. 38.

13. Later that day, Cox turned over Elmquist's original hard drive, Cox's hard drive, and the two CDs to Dvorak. 21.

14. Cox did not intend to contact law enforcement officers himself; instead, he turned the material over to Dvorak and let him make those decisions. 28-29.

15. Still later that afternoon, Cox was contacted by Detective Dan Justus of the North Kansas City Police Department and was asked to come in to police headquarters to give a statement.[1] 18-19, 30, 50.

16. Initially, Cox was reluctant to speak with law enforcement officers because he was fearful of losing his job. 19, 53-55.

17. During the initial telephone conversations, Det. Justus did not ask whether the questionable files had been copied, did not suggest that any evidence needed to be preserved, and did not provide any instructions or advice to Cox. 54, 58.

18. Eventually, on July 13, 2006, Cox went to the North Kansas City Police Department and gave a written statement to Det. Justus. 22, 60-61.

19. Following the interview, Det. Justus again contacted Cox on the telephone to obtain the serial numbers for the two hard drives and the type of CD that was used by Cox. 61-62.

20. Later on the afternoon of July 13, Det. Justus applied for a search warrant in the Circuit Court of Clay County Missouri. 62; Def't #5.

---

[1] After receiving the telephone call from his son, Frank Cox contacted the police department. Tr. at 18-19.

21. The search warrant application sought authorization to seize the two computer hard drives and the two CDs as well as other computer-related materials including "all items relating to internet chat." 64; Def't #5.

22. After the search warrant was issued and executed, the items seized were sent to a computer forensics lab. 66.

23. The computer forensics lab examined the seized materials and ultimately reported that they found images of child pornography and evidence of the use of AOL screen names "STARSE7" amd "StarrSE7." 67.

24. Thereafter, Det. Justus issued a grand jury subpoena to AOL related to the screen names that yielded further incriminating materials and information. 68

25. On October 31, 2006, at the direction of Det. Justus, Elmquist was asked by the police to come in for questioning. 77-78.

26. According to Det. Justus, given the information gathered by the police at that point in time, Elmquist was probably not free to leave and ignore the request that he come in for questioning. 79.

27. Upon arriving at the police station, Elmquist signed a form waiving his *Miranda* rights. 79-80, 87, Def't #3.

28. Thereafter, Det. Justus and another detective interviewed Elmquist for approximately three hours, from 1:27 p.m. to 4:45 p.m. 80.

29. The interview was recorded on video and audio. 80.

30. After approximately two and one-half hours of the interview, Elmquist made four statements touching on the issue of legal counsel, to wit:

    3:54 p.m.   "I know what happened to me and I'm a little naive about the full legalities of this thing and I think I've been a pretty good Joe in sitting here without any counsel which I dare say I could have any time I wanted to."

    3:57 p.m.   "Am I doing myself a disservice not knowing the law and the facts against that by not having counsel here and being advised cause I'm just taking what little knowledge I know and responding as candidly as I can to your questions."

4

    4:21 p.m.  "I need for my own benefit somebody that's supporting my end of this, to say, you know: 'Ron, tell me the facts that you told them, and the facts are on the table, and I'll give you good counsel to say your very best recourse is to compromise yourself and downloading those, whatever the reason, and we feel very good the reason is exactly what you believe and it is not the intent to do that because I could have times 50 if that was my intent with the availability on the internet, not my intent, however, the better course is to do the following and this is what we recommended."

    4:37 p.m.  "Why wouldn't I go down that route to get counsel so he could tell me: 'Ron, that is the right decision, and what they recommended is clearly for the following circumstances, I'm going to read you the law, bingo, that's what it is and it's verbatim what they said. So, let's get in there and work with this the best way we can and then try to rebuild all that this means to you and to your life by the fact that you did download those things.' Am I just off-base by saying I need that input?"

  Tr. 80-85; Def't #1, 2, 8.

31. Elmquist never directly requested an attorney during his questioning on October 31. 88.

32. The day after questioning Elmquist, Det. Justus filed a statement of probable cause with the state court and an arrest warrant was issued for Elmquist. 86.

## PROPOSED CONCLUSIONS OF LAW

In his motions to suppress, Elmquist raises several arguments, to wit:

 (1) The initial seizure of Elmquist's computer data storage media by QualServe employees was unlawful inasmuch as the employees were acting as agents of or in participation with law enforcement authorities;

 (2) The warrant subsequently issued for the search of Elmquist's computer data storage media was defective in that it was overly broad; and

 (3) Certain statements made by Elmquist during his custodial interrogation with the North Kansas City Police Department were obtained only after Elmquist had requested representation of counsel.

The Court will address each of Elmquist's issues in turn.

5

## A. QualServe employees as agents of law enforcement

It is well-settled that "[a] search by a private citizen is not subject to the strictures of the Fourth Amendment unless that private citizen is acting as a government agent." *United States v. Smith*, 383 F.3d 700, 705 (8th Cir. 2005) (*citing United States v. Malbrough*, 922F.2d 458, 461-62 (8th Cir. 1990)). In determining whether a private citizen "acts as" a government agent, the courts consider several factors, including

> (1) whether the government had knowledge of and acquiesced in the intrusive conduct of the private citizen,
>
> (2) whether the private citizen intended to assist law enforcement by his actions, and
>
> (3) whether the private citizen acted at the government's request.

*Malbrough*, 922F.2d at 462. Moreover, the mere fact "[t]hat a private citizen is motivated in part by a desire to aid law enforcement does not in and of itself transform her into a government agent." *Smith*, 383 F.3d at 705. *See also Coolidge v. New Hampshire*, 403 U.S. 443, 488 (1971) ("[I]t is no part of the policy underlying the Fourth and Fourteenth Amendments to discourage citizens from aiding to the utmost of their ability in the apprehension of criminals.").

On the evidence presented in this matter, the Court cannot conclude that Cox (or Dvorak) was acting as a government agent. Elmquist himself surrendered his[2] laptop computer to Cox

---

[2] The evidence established that the laptop computer was actually the property of QualServe. As a result there may be questions as to Elmquist's standing to assert a Fourth Amendment claim as to the laptop computer and/or the scope of Elmquist's legitimate expectation of privacy with regard to the laptop computer. Inasmuch as the government has not raised these issues, the Court will assume that Elmquist can raise a Fourth Amendment claim regarding the laptop computer and the scope of such claim is not diminished by the ownership of the laptop computer.

6

and permitted Cox to examine it (including the files contained within the hard drive). Cox found disturbing images, copied the hard drive and burned two CDs all without any contact with law enforcement. Moreover, the decision of Cox and Dvorak to retain Elmquist's original hard drive — while dovetailing with law enforcement needs to preserve evidence — seems to have been the product of what Cox described as being "just a logical thing to do."

### B. The breadth of the warrant

Elmquist argues that law enforcement officers made an impermissibly broad request when seeking the search warrant in this case. More specifically, Elmquist argues that the officers – at the time they requested the search warrant – were only aware of potential child pornography being located in the "Temporary Internet" and "My Recent Document" files on the laptop computer. Det. Justus' application, however, addressed computer-related materials beyond those two areas of the hard drive. Indeed, in conformity with Det. Justus' application, the ensuing search warrant permitted seizure of Elmquist's original hard drive, Cox's hard drive (where he had copied Elmquist's hard drive), the two CDs burned by Cox as well as:

> any items relating to internet chat, screen names, chat logs, and map searches, picture files and/or graphic images, stored on the hard drives, in email files, on magnetic media such as tapes, compact disks,, and other computer related operating equipment or any computer storage media, software for operating systems, also passwords, and user information which may be stored on the items previously listed, for any items, records, or documents relating to Child Pornography.

If an affidavit in support of a search warrant "sets forth sufficient facts to lead a prudent person to believe that there is a 'fair probability that contraband or evidence of a crime will be found in a particular place,'" probable cause to issue the warrant has been established. *United States v. Warford*, 439 F.3d 836, 841 (8th Cir.2006) (*quoting*, *in part*, *Illinois v. Gates*, 462 U.S.

7

213, 238 (1983)). Whether probable cause to issue a search warrant has been established is determined by considering the totality of the circumstances, and resolution of the question by an issuing judge "'should be paid great deference by reviewing courts.'" *Gates*, 462 U.S. at 236 (*quoting, in part, Spinelli v. United States*, 393 U.S. 410, 419(1969)). Accordingly, federal courts examine the sufficiency of a search warrant affidavit using a "common sense" and not a "hypertechnical" approach. *United States v. Grant*, 490 F.3d 627, 631 (2007). However, it also has been long understood that the importance of the particularity requirement arises out of a hostility to the English Crown's practice of issuing "general warrants" to authorize the wholesale rummaging through a person's property in search of contraband or evidence. *Coolidge v. New Hampshire*, *supra*, 403 U.S. at 467. Balancing these notions is especially challenging when confronting search warrants addressed to electronically stored and accessed information. To that end, the Eighth Circuit has noted that "[t]he degree of specificity required will depend on the circumstances of the case and on the type of items involved." *United States v. Horn*, 187 F.3d 781, 788 (8th Cir.1999).

In this case, the search warrant, while not limited to only the "Temporary Internet" and "My Recent Document" files on Elmquist's laptop computer, was confined to computer-related materials maintained by Elmquist at QualServ. Given the nature of the material sought (stored electronic images) by law enforcement, the search warrant was not overbroad.

The recent case of *United States v. Summage*, 481 F.3d 1075 (8th Cir. 2007), is instructive. In *Summage*, law enforcement officers received information that the suspect had forced a woman to engage in sexual activities while videotaping and photographing the acts. *Id.* at 1076. Subsequently, law enforcement officers sought and obtained a search warrant

8

permitting the seizure of several items including "all videotapes and DVDs" and all "computers." *Id*. at 1077. The district court eventually suppressed all evidence gathered under the search warrant. On appeal the Eighth Circuit reversed.

The court in *Summage* addressed several issues related to the search warrant, including an assertion that the warrant was overbroad. In ruling on this issue, the court acknowledged that the search warrant broadly sought "all video tapes and DVDs, pornographic pictures, video and digital recording devices and equipment, all equipment that is used to develop, upload, or download photographs and movies, computers, and any indicia of occupancy." *Id*. at 1079. The court also agreed that "[a]t the time the warrant was applied for, the officers knew only that a video and photographs of the alleged incident supposedly existed, not the particular format in which these items were being kept. *Id*. Nonetheless, the court concluded that:

> Because no indication was given regarding the nature of the format in which the sought-for video and photographs were created or stored, it was necessary to search a broad array of items for the relevant materials, the on-site search of which could take a significant amount of time. Given these circumstances and the practical concerns associated therewith, we conclude that the warrant was neither over-broad nor lacking in particularity.

*Id*. at 1079-80. *See also United States v. Upham*, 168 F.3d 532, 535 (1st Cir.1999) ("As a practical matter, the seizure and subsequent off-premises search of the computer and all available disks was about the narrowest definable search and seizure reasonably likely to obtain the images."); *United States v. Alexander*, 2007 WL 2712043, op. at – (W.D. Mo. Sept. 14, 2007) ("The affidavit in support of the . . . search warrant adds that child pornography was discovered on [the defendant's] computer. Given the difficulty in determining the particular format in which [the] defendant . . . may have maintained evidence relating to invasion of privacy or child

9

pornography, the Court finds the warrants [broadly authorizing seizure of computer-related materials] to be sufficiently particular with regard to the items to be seized.").

While the seizure of an entire computer undoubtedly results in the disclosure of materials and information that a defendant legitimately would wish to keep private and about which the government is not entitled to inquire, under the facts in this particular case, the intrusion has been minimized to the greatest extent possible while still enabling law enforcement officers to pursue their legitimate role of investigating possible criminal activity. Indeed, the intrusion to private citizens is far greater in many other types of authorized search and seizure cases. As noted by another court:

> A sufficient chance of finding some needles in the computer haystack was established by the probable-cause showing in the warrant application; and a search of a computer and co-located disks is not inherently more intrusive than the physical search of an entire house for a weapon or drugs.

*United States v. Upham*, 168 F.3d 532, 535 (1st Cir. 1999).

### C. Elmquist's invocation of counsel

The Fifth Amendment of the United States Constitution commands that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. With regard to the Fifth Amendment, the Supreme Court has found:

> The essence of this basic constitutional principle is the requirement that the [government] which proposes to convict and punish an individual produce the evidence against him by the independent labors of its officers, not by the simple, cruel expedient of forcing it from his own lips.

*Estelle v. Smith*, 451 U.S. 454, 462 (1981). However, as the Supreme Court has made clear on numerous occasions, the right against self-incrimination does not prohibit any and all statements

10

made by suspects to law enforcement officers from being admissible in a criminal proceeding. For example:

> [The Fifth Amendment] does not preclude a witness from testifying voluntarily in matters which may incriminate him, . . . for those competent and freewilled to do so may give evidence against the whole world, themselves included. . . . Indeed, far from being prohibited by the Constitution, admissions of guilt by wrongdoers, if not coerced, are inherently desirable.

*U.S. v. Washington*, 431 U.S. 181, 186-87 (1977). The touchstone of such Fifth Amendment analysis is voluntariness. *Dickerson v. U.S.*, 530 U.S. 428, 434 (2000) ("We . . . continue to exclude confessions that were obtained involuntarily.").

With regard to statements made by a suspect during custodial interrogation by law enforcement, the Supreme Court, in the landmark case of *Miranda v. Arizona*, 384 U.S. 436 (1966), enunciated a special test for ascertaining voluntariness. The reason for such special treatment stems from the Supreme Court's recognition that custodial interrogations are inherently coercive. *Dickerson*, 530 U.S. at 435; *New York v. Quarles*, 467 U.S. 649, 654 (1984). Indeed, in *Miranda,* the Supreme Court observed that custodial interrogations, by their very nature, generate "inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Miranda*, 384 U.S. at 467. Consequently,

> To combat this inherent compulsion, and thereby protect the Fifth Amendment privilege against self-incrimination, *Miranda* imposed on the police an obligation to follow certain procedures in their dealings with the accused.

*Moran v. Burbine*, 475 U.S. 412, 420 (1986). These procedures, now almost universally familiar, include fully apprising a suspect of the prosecution's intention to use his statements to secure a

11

conviction and informing him of his rights to remain silent and to have counsel present if he so desires. *Miranda*, 384 U.S. at 468-70.

Despite the inherently coercive nature of custodial interrogations, it is well settled that a criminal suspect may waive the rights contained in the *Miranda* warnings "provided the waiver is made voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 444. However, the Supreme Court in *Miranda* also stated that if an accused "indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning." *Id.* at 444-45. Moreover, the *Miranda* court specifically contemplated the possibility that an accused might be indecisive about whether to have an attorney present:

> If [an accused] is indecisive in his request for counsel, there may
> be some question on whether he did or did not waive counsel.
> Situations of this kind must necessarily be left to the judgment of
> the interviewing Agent.

*Id*. at 485.

Elmquist concedes that he signed a *Miranda* waiver at the beginning of his interview with Det. Justus, but argues that he subsequently invoked a right to counsel on four occasions about two and one-half hours into the questioning. Because the interview was recorded, there are no disputes at to the language used by Elmquist. On those four occasions, Elmquist stated:

> "I know what happened to me and I'm a little naive about the full
> legalities of this thing and I think I've been a pretty good Joe in
> sitting here without any counsel which I dare say I could have any
> time I wanted to."

> "Am I doing myself a disservice not knowing the law and the facts
> against that by not having counsel here and being advised cause
> I'm just taking what little knowledge I know and responding as
> candidly as I can to your questions."

12

> "I need for my own benefit somebody that's supporting my end of this, to say, you know: 'Ron, tell me the facts that you told them, and the facts are on the table, and I'll give you good counsel to say your very best recourse is to compromise yourself and downloading those, whatever the reason, and we feel very good the reason is exactly what you believe and it is not the intent to do that because I could have times 50 if that was my intent with the availability on the internet, not my intent, however, the better course is to do the following and this is what we recommended."

> "Why wouldn't I go down that route to get counsel so he could tell me: 'Ron, that is the right decision, and what they recommended is clearly for the following circumstances, I'm going to read you the law, bingo, that's what it is and it's verbatim what they said. So, let's get in there and work with this the best way we can and then try to rebuild all that this means to you and to your life by the fact that you did download those things.' Am I just off-base by saying I need that input?"

In determining whether a defendant has invoked the right to counsel so as to require termination of law enforcement questioning under *Miranda*, the Eighth Circuit has set forth a clear test, holding that "only a clear and unequivocal request for the assistance of counsel may serve to invoke a defendant's right." *United States v. Kelly*, 329 F.3d 624, 630 (8th Cir. 2003). The Court concludes that the comments made by Elmquist during his interview with Det. Justus were attempts to curry favor with the officers because Elmquist had decided not to bring in an attorney and these statements were not a clear and unequivocal request for the assistance of counsel. *Compare Davis v. United States*, 512 U.S. 452, 455 (1994) (finding that the statement, "[m]aybe I should talk to a lawyer" was insufficient to alert a reasonable officer that the defendant was requesting counsel and stating that, although it is good policy for officers to clarify ambiguous statements, they are not required to do so); *Dormire v. Wilkinson*, 249 F.3d 801, 805 (8th Cir.2001) (holding that the statement "[c]ould I call my lawyer" was insufficient to invoke the right to counsel and mandate termination of questioning).

13

Accordingly, it is

**RECOMMENDED** that the Court, after making an independent review of the record and applicable law, enter an order **DENYING** Elmquist's MOTION TO SUPPRESS EVIDENCE AND MEMORANDUM IN SUPPORT filed September 24, 2007 (Doc. #13) and Elmquist's MOTION TO SUPPRESS STATEMENT AND MEMORANDUM IN SUPPORT, filed September 24, 2007 (Docs. #14).

Counsel are reminded that each has 10 days from the date of receipt of a copy of this report and recommendation to file and serve specific objections to the same. A failure to file and serve timely objections shall bar attack on appeal of the factual findings in this report which are accepted or adopted by the district judge except upon the ground of plain error or manifest injustice.

        */s/ John T. Maughmer*
        **John T. Maughmer**
        **United States Magistrate Judge**